```
                  UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS


PATRICK J. HANNON,            )
                              )
            Plaintiff,        )   CIVIL ACTION NO.
                              )   11-10021-DPW
v.                            )
                              )
CITY OF NEWTON,               )
                              )
            Defendant,        )
                              )
and                           )
                              )
UNITED STATES OF AMERICA,     )
COMMONWEALTH OF MASSACHUSETTS,)
and RITA S. MANNING,          )
                              )
            Intervenors.      )
```

MEMORANDUM AND ORDER
October 24, 2011

The United States and Rita S. Manning, creditors of plaintiff-taxpayer Patrick J. Hannon, have intervened to claim an interest in the proceeds of this land damage litigation brought by Hannon against the City of Newton after the city took his real property under the power of eminent domain. The United States and Manning have each moved for summary judgment, asserting priority in the order in which their claims should be paid from the litigation proceeds. I will grant summary judgment to Rita Manning and deny it to the United States because the United States chose to discharge its lien on Hannon's property pursuant to 26 U.S.C. § 6325(b)(2)(A) rather than 26 U.S.C. § 6325(b)(3) and thereby surrendered its priority claim to proceeds generated by litigation after the discharge.

## I. BACKGROUND

On November 10, 2008, Hannon filed this lawsuit in the Middlesex Superior Court against the City of Newton, alleging under-compensation for the taking of his real property located at 20 Rogers Street, Newton MA ("the Property"). The City had taken the Property on May 7, 2007 under the power of eminent domain and made a *pro tanto* payment of $2,300,000. Hannon thereafter won a money judgment of $420,000 in additional compensation and on October 4, 2010, the City deposited the amount due (including interest in the amount of $31,245.72) with the court. The court ordered that $151,761.73 be paid out to Hannon's attorneys, leaving $299,483.99 to be distributed.

Three of Hannon's creditors then intervened, claiming an interest in the money judgment. One such creditor, the Commonwealth of Massachusetts, through its Department of Revenue, subsequently disclaimed any interest in the proceeds. The other two creditors now dispute who has priority in the distribution of the lawsuit's proceeds.

Manning's claim to the proceeds is as a judgment creditor. She had obtained a judgment against Hannon on March 17, 2005 in the Middlesex Superior Court in the amount of $103,333.33. On June 9, 2005, she obtained an execution for precisely that

amount[1] affecting Hannon's "goods, chattels [and] land."  The execution was recorded at the Middlesex County Registry of Deeds on June 28, 2005.

The claim of the United States to priority in the proceeds is based on Hannon's federal income tax liabilities.  A delegee of the Secretary of Treasury made assessments for income tax, penalties, and interest for the years 1999, 2000, and 2001 against Hannon and his wife at various times from December 17, 2001 through October 15, 2005.  As of November 5, 2010, the Hannons owed the United States $7,311,890.07.  That amount (and perhaps other tax liability as well) remains due and owing, with statutory additions and interest from that date.  A delegee of the Secretary of the Treasury filed Notices of Federal Tax Lien ("NFTLs") for these assessed tax liabilities at the Registry of Deeds for Southern Middlesex County at various times from February 8, 2003 through February 23, 2004, and at the United States District Court in Boston at various times from January 24, 2003 through February 6, 2004.

On May 4, 2007, three days before the City of Newton issued its Order of Taking regarding the Property, the Internal Revenue

---

[1]  Manning might have been entitled to prejudgment interest, postjudgment interest, or both pursuant to Mass. R. Civ. P. 54(f); G.L. c. 235, § 8; and G.L. c. 231, § 6B or § 6C.  However, the clerk neither computed nor included interest in the execution.  Thus, no such interest was included within Manning's claim under the lien supported by the execution.

Service ("IRS") issued a Certificate of Discharge for the Property.  The Certificate states:

> Whereas, Patrick J & Elizabeth Hannon, of 21 Floral Street, Newton MA 02161 is/are indebted to the United States for unpaid internal revenue tax, as evidenced by [the three NFTLs filed at the Middlesex Registry of Deeds for their income tax liabilities for the years 1999, 2000, and 2001] . . . . Whereas, the lien of the United States, listed above, for said tax has attached to certain property described as: 20 Rogers Street, Newton, MA . . . . Whereas, the Area Director of Internal Revenue has determined that the value of the interest of the United States in the foregoing property, under and by virtue of its aforesaid tax lien, amounts to the sum of $57,214.55[2] . . . . Now, therefore, this instrument witnesseth, that I, Rebecca A. Chiaramida, Collection Area Director, North Atlantic Area of Internal Revenue Service . . . do, pursuant to the provisions of section 6325(b)(2)(A) of the Internal Revenue Code, discharge the property heretofore described from the aforesaid tax lien, saving and reserving, however, the force and effect of said tax lien against and upon all other property or rights to property to which said lien is attached, wheresoever situated."

The Certificate was recorded on July 17, 2007.

The United States removed the case to this court on January 6, 2011.  The United States and Manning respectively have filed cross-motions for summary judgment.  The parties dispute the effect of the Certificate of Discharge on the claim of the United States to the lawsuit's proceeds and on the question of whose claim has priority in the distribution of the interpleader fund.

---

[2]  This value apparently was derived from the eminent domain *pro tanto* monies remaining after the priority mortgage payoff due to Merrill Lynch.

## II. STANDARD OF REVIEW

A movant is entitled to summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party," and "[a] fact is material if it has the potential of determining the outcome of the litigation." *Farmers Ins. Exch. v. RNK, Inc.*, 632 F.3d 777, 782 (1st Cir. 2011) (quoting *Rodríguez-Rivera v. Federico Trilla Reg'l Hosp.*, 532 F.3d 28, 30 (1st Cir. 2008)).

In evaluating a motion for summary judgment, a court must "view the facts in the light most favorable to the party opposing summary judgment." *Rivera-Colón v. Mills,* 635 F.3d 9, 10 (1st Cir. 2011). "Where, as here, a district court [is called upon to] rule[] simultaneously on cross-motions for summary judgment, it must view each motion, separately, through this prism." *Estate of Hevia v. Portrio Corp.*, 602 F.3d 34, 40 (1st Cir. 2010). Thus, the "court may enter summary judgment only if the record, read in this manner, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.*

## III. DISCUSSION

Neither party disputes that the IRS was first to record a lien against Hannon, that Manning did so subsequently, or that the IRS issued a Certificate discharging the Property from the liens. The parties' cross-motions dispute the significance of the Certificate of Discharge and whether the United States has a continuing interest in the interpleader fund based on its liens. The United States contends that it discharged solely its interest in the Property, reserving an interest in the chose in action arising from under-compensation and in the proceeds generated from such litigation as an entirely separate intangible property interest. Manning contends that when the United States discharged its liens on the Property, it discharged its priority interest in any proceeds from a sale or taking of the Property since the proceeds substituted for the land as to which the liens were discharged.

### A. *The Federal Statutory Scheme*

The Certificate of Discharge states that it was issued pursuant to 26 U.S.C. § 6325(b)(2)(A). The statute details the terms of such a discharge:

> Subject to such regulations as the Secretary may prescribe, the Secretary may issue a certificate of discharge of any part of the property subject to the lien if . . . there is paid over to the Secretary in partial satisfaction of the liability secured by the lien an amount determined by the Secretary, which shall not be less than the value, as determined by the Secretary, of the interest of the United

6

States in the part to be so discharged.  26 U.S.C. § 6325(b)(2).

Notably, the IRS did not choose to discharge the liens pursuant to 26 U.S.C. § 6325(b)(3).  That subsection provides:

> Subject to such regulations as the Secretary may prescribe, the Secretary may issue a certificate of discharge of any part of the property subject to the lien if such part of the property is sold and, pursuant to an agreement with the Secretary, the proceeds of such sale are to be held, as a fund subject to the liens and claims of the United States, in the same manner and with the same priority as such liens and claims had with respect to the discharged property.  26 U.S.C. § 6325(b)(3).

In subsection (b)(3), Congress provided for a discharge of liens in a way that would permit the IRS to maintain an interest in the proceeds of the sale of the discharged property.  By instead choosing to discharge the Property pursuant to subsection (b)(2)(A), the IRS collected its payment before the financial terms of the City of Newton's exercise of its power of eminent domain had been fully clarified in the form of land damage action proceeds.

Several courts have noted[3] the difference between discharges pursuant to the two subsections and concluded that when the IRS chooses to discharge pursuant to subsection (b)(2)(A) instead of subsection (b)(3), it gives up its priority claim to the proceeds of the sale of the discharged property.

---

[3]  Remarkably, neither party addressed these cases in their respective summary judgment submissions.

In *Estate of Frazier v. Dist. Dir., I.R.S.*, No. 1:91-CV-1877-JTC, 1992 WL 472026 (N.D. Ga. Oct. 14, 1992), the district court rejected the government's argument that it maintained its priority right to property sale proceeds after a § 6325(b)(2)(A) discharge of the property (precisely the argument it is making here), holding that "because the government elected to discharge the lien pursuant to § 6325(b)(2), and not pursuant to § 6325(b)(3), the government has no lien on the specific proceeds." *Id*. at *9.

The court in *U.S. v. Holtzclaw*, Civil No. S-84-402 MLS, 1988 U.S. Dist. LEXIS 16355 (E.D. Cal. Dec. 12, 1988), came to the same conclusion:

> The court is not persuaded by plaintiff's argument that its tax liens automatically attach to the surplus proceeds under the general principle that tax liens attach to all property of the taxpayer. A specific statutory provision exists under the Internal Revenue Code that provides for the transfer of tax liens from real property to the sale proceeds . . . . Because the Internal Revenue Code has its own specific mechanism [provided in 26 U.S.C. § 6325(b)(3)] for substituting the sale proceeds in place of the real property for satisfaction of federal tax liens, the government's failure to comply with those procedures results in a waiver of its right to proceed against the surplus sale proceeds. *Id*. at *18-19.

In short, as the bankruptcy court for the Northern District of Georgia observed, "by discharging the tax liens pursuant to [§ 6325(b)(2)], the Service relinquished its preferred status as the holder of a tax lien." *In re Miller*, 98 B.R. 110, 112 (N.D. Ga. 1989) (drawing the same distinction between 26 U.S.C. § 6325(b)(2) and (b)(3)).

I find the reasoning of these courts persuasive.  Congress provided the IRS with two options for discharging a lien on property without waiving the right of the United States to priority payment.  Under 26 U.S.C. § 6325(b)(3), the IRS discharges the property while expressly maintaining its right to the proceeds after the sale is complete.  Under 26 U.S.C. § 6325(b)(2)(A), the IRS calculates its interest and collects the value of that interest in exchange for a discharge of the property.  The IRS here collected the value of its interest as calculated under § 6325(b)(2)(A) in exchange for the discharge and maintains no continuing interest based on the liens in any subsequent proceeds from the taking of the Property.[4]

The requirement that 26 U.S.C. § 6325(b)(2)(A) imposes on the IRS supports this reading of the statute.  The IRS may only issue a discharge of the taxpayer's property pursuant to this subsection if the Secretary is paid "an amount determined by the Secretary, which shall not be less than the value, as determined by the Secretary, of the interest of the United States in the part to be so discharged."  26 U.S.C. § 6325(b)(2)(A).  If the

---

[4] A § 6325(b)(2)(A) discharge might make sense where, for instance, the value of a property is undisputed and the government wants to ensure expeditious payment of the value of its interest to be discharged. It is difficult to imagine a situation in which a § 6325(b)(2)(A) discharge would be a wise course of action where eminent domain is involved and where the property value may be disputed. Unfortunately for the United States, however, that is the course it chose with respect to the property at issue in this case.

IRS could maintain its lien on the proceeds of a subsequent sale, it would be anomalous to require that the money accepted in exchange for the discharge *also* equal the value of that entire interest.  The clearest rationale for this requirement is that Congress did not anticipate that additional funds would be readily accessible based on tax liens after a 26 U.S.C. § 6325(b)(2)(A) discharge, and therefore required that the Secretary collect the value of the entire interest of the United States in the property in exchange for the Certificate of Discharge.

As a matter of federal statutory law, when it issued the discharge pursuant to 26 U.S.C. § 6325(b)(2)(A) the United States surrendered its interest in any additional damages that might be--and subsequently were--due Hannon as a result of any subsequent land damage proceeding.  Because the government has no lien on the litigation proceeds, Manning's lien has priority.

**B.   *The State Property Regime***

The position of the United States fares no better when the focus turns from the federal statutory scheme to the state property regime which provides the foundation for analysis of the reach of a federal tax lien.  The Supreme Court has instructed that "[t]he federal tax lien statute itself creates no property right but merely attaches consequences, federally defined, to

rights created under state law." *United States v. Craft*, 535 U.S. 274, 278 (2002) (internal citations omitted).

Massachusetts law has long been settled that proceeds received as damages arising out of an eminent domain taking are, in the words of Chief Justice Shaw, "to be regarded as capital substituted, by act of law, in the place of the land taken." *Gibson v. Cooke*, 42 Mass. (1 Met.) 75, 76 (1840). *See also Spadea v. Stewart*, 214 N.E.2d 72, 74 (Mass. 1966) ("compensation for the taking represents the land"); *Cornell-Andrews Smelting Co. v. Boston & Providence Railroad Corp.*, 95 N.E. 887, 890 (Mass. 1911) ("compensation paid for land taken by the exercise of the power of eminent domain in equity represents the land and is subject to all the rights of persons who had rights in the land.").

The United States dismisses this treatment of eminent domain proceeds as a "legal fiction." However, the use of a dismissive label cannot overcome the settled understanding of state property rights. Although equitable conversion may be a legal fiction in the sense that the law treats money as if it were land, it is not a legal fiction regarding the question relevant here: whether it accurately describes what rights the parties have in the eminent domain damages.

The United States cites three cases in support of its contention that equitable conversion is inapplicable here

because, as a state law "legal fiction," it cannot defeat the attachment of a federal tax lien.  Each is inapposite.

In *United States v. Craft*, the Court held that, although "Michigan characterizes its tenancy by the entirety as creating no individual rights whatsoever," in reality Michigan law accorded a tenant by the entirety a significant number of property rights.  535 U.S. 274, 281-82 (2002).  In *Drye v. United States*, the Court held that, although Arkansas law allowed an heir to disclaim his inheritance, nonetheless Arkansas law accorded the heir significant property rights in that it gave him the choice to inherit or to channel the inheritance elsewhere.  *Drye*, 528 U.S. 49, 59-61 (1999).  In both cases the Court concluded that the interest involved was therefore "property" for the purposes of federal tax law.  *Craft*, 535 U.S. at 288; *Drye*, 528 U.S. at 61.

The Court in both *Craft* and *Drye* disregarded state law labels and looked to the underlying substantive property rights.  In the instant case, regardless of the doctrine's label, Massachusetts law accords Manning the same interest in the land damage litigation proceeds as she maintained in the Property before the exercise of the power of eminent domain.  *Cornell-Andrews Smelting Co.*, 95 N.E. at 890 (Mass. 1911).  The federal tax lien statute "merely attaches consequences, federally defined," to that state-created property right, *Craft*, 535 U.S.

at 278, and therefore Manning maintains her lien on the litigation proceeds just as she maintained her lien on the Property itself.

The third case cited by the United States, *Landmark First Nat. Bank of Fort Lauderdale v. Comm'r of Corps. and Taxation*, 378 N.E.2d 458 (Mass. App. 1978), relates to Massachusetts tax law.  "The interpretation of [a federal tax statute] is a federal question, and in answering that question [federal courts] are in no way bound by state courts' answers to similar questions involving state law."  *Craft*, 535 U.S. at 288.  Federal tax law looks to the substantive rights described by Massachusetts property law; how a property subject to equitable conversion might be taxed under Massachusetts law simply does not figure into the analysis.

The United States further attempts to challenge the applicability of the doctrine of equitable conversion by suggesting that whatever property interest Manning had was only in the land and not in the damages resulting from its taking by eminent domain.  The argument rests on artificial distinctions.  It proceeds by splintering the stick that constitutes the underlying property right.  *Cf. United States v. Craft*, 535 U.S. at 278 (using the metaphor of "'a bundle of sticks'--a collection of individual rights which, in certain combinations, constitute property").  The United States identifies three separate and

successive property interests involved in the eminent domain proceeding.  First, there is the real property itself.  Manning's execution of the judgment plainly attaches to that because it reaches Hannon's "goods, chattels or land."  But the eminent domain proceeding, the United States contends, transmuted the interest in the land into a second interest in a chose of action, which is an intangible property right not within the scope of the execution.  Moreover, the land damage proceeds, which the United States identifies as a third property interest, are similarly said to be outside the terms of the execution.

This splintering of one property right into three is far too technical a treatment of the core interest involved.  Massachusetts law clearly recognizes one continuing interest: successively in the land, the chose in action, and the proceeds, with the latter two dimensions to the single interest being treated as a representation of the land.  Manning maintained that interest throughout the eminent domain proceeding and to this day.  The United States chose not to do so.  Relabelling the interest to reflect the various stages of the eminent domain proceeding will not oust Manning of her secured interest in the property right.

In a similarly unpersuasive exercise in artificial relabelling, the United States contends that if the proceeds of the litigation are treated as analogous to the real property,

then the Certificate of Discharge would be void pursuant to 26 C.F.R. § 301.6325-1(f)(3) due to Hannon's "reacquisition" of the property.  However, Hannon did not sell and then reacquire the property as the regulation contemplates.  Rather, his land was subject to a taking, and he subsequently received a partial payment in lieu of the Property through the *pro tanto*.  He then sought more money through a land damage action.  Claiming that the final payment made by the City of Newton was part of an "acquisition" does not obscure its true identity as damages compensating the taxpayer for the earlier taking.

The United States made a deliberate, if improvident,[5] choice to liquidate its priority interest in the Hannon property through a § 6325(b)(2)(A) discharge in the face of an eminent domain taking.  In doing so it secured immediate payment from the *pro tanto* payment.  It gave up for this immediacy the further--but delayed--opportunity for additional compensation from a land damage action.  Having made its choice, it may not return to revive a preferred interest in proceeds from the litigation.

---

[5]  In a curious argument, the United States suggests that because it may have misapprehended the meaning of § 6325(b)(2) and its right to recovery of proceeds under that statutory provision, the statute should be read to avoid the consequences of this misapprehension.  Needless to say, the statute will be read according to its plain terms, irrespective of any self-serving misunderstanding of its meaning by one of the parties.

## IV. CONCLUSION

For the reasons set forth above, I (1) DENY the United States' motion for summary judgment (Dkt. No. 8); and (2) GRANT Rita Manning's cross-motion for summary judgment (Dkt. No. 15). I direct the clerk to enter final judgment in Manning's favor providing that the remaining funds from the lawsuit proceeds be distributed first to Manning to the extent of her outstanding judgment lien in the amount of $103,333.33, with the remainder to be distributed to the United States as an unsecured creditor.

  /s/ Douglas P. Woodlock
  DOUGLAS P. WOODLOCK
  UNITED STATES DISTRICT JUDGE